Filed 5/20/26  P. v. Smith CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA SMITH,<br><br>Defendant and Appellant. | F086949<br><br>(Super. Ct. No. BF189455B)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>[NO CHANGE IN JUDGMENT] |

**THE COURT:**

It is ordered that the opinion filed herein on April 24, 2026, be modified in the following particulars:

1.  On page 15, after the second full paragraph beginning "The prosecution introduced into evidence" and before the paragraph beginning "The trial evidence amply demonstrated," the following paragraph inserted:

The jury learned that illegal firearm possession was one of the gang's primary activities, along with burglaries and other crimes.  The gang expert made it clear that firearm possession provided the gang with benefits that went beyond mere reputation—such as protection, entering rival territory, and facilitating additional crimes.  These were immediate and concrete operational benefits.  The predicate offenses involved multiple gang members acting together while armed, including conduct directed at rivals and the detention of armed gang members after a shooting in rival gang territory.  Thus, the jury could reasonably infer that the predicate

offenses were linked to the gang's collective criminal activities, rather than representing isolated criminal conduct by individual gang members.  (See *Clark, supra*, 15 Cal.5th at p. 762 [organizational nexus may be shown by linking predicate offenses to a gang's primary activities].)

2.   On page 16, the sentence "Appellant's reliance on *Clark* and *Farley* is unavailing" is deleted from the paragraph beginning at the bottom of page 15 with "The trial evidence amply demonstrated …"

3.   On page 16, in the last sentence of the last full paragraph, the phrase "facilitating other criminal opportunities" is changed to "financial gain" so the sentence reads:

Examples of qualifying benefits include retaliation against rivals, intimidation of witnesses, or financial gain.

Except for the modifications set forth herein, the opinion previously filed remains unchanged.  These modifications do not alter the judgment.  Appellant's petition for rehearing is denied.

LEVY, Acting P. J.

WE CONCUR:

MEEHAN, J.

DESANTOS, J.

2.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSHUA SMITH,<br><br>Defendant and Appellant. | F086949<br><br>(Super. Ct. No. BF189455B)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  Gregory A. Pulskamp, Judge.

William Safford, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Christopher J. Rench and Kelly E. LeBel, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In 2022, appellant Joshua Smith was with his codefendant Ronald Goosby[1] when appellant fired multiple shots that struck two victims, both of whom survived. In 2023, a jury convicted appellant of premeditated attempted murder (Pen Code, §§ 664, 187, subd. (a);[2] count 2) and two counts of assault with a semiautomatic firearm (§ 245, subd. (b); counts 3 & 4). In all three counts, the jury found true gang enhancement allegations (§ 186.22, subd. (b)(1)). The jury also found true that appellant personally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), and he personally used a firearm (§ 12022.5, subd. (a)). Appellant received a determinate sentence of 19 years and a consecutive aggregate term of 40 years to life.

Appellant raises six claims in this appeal, including alleged instructional and sentencing errors, insufficiency of the evidence, a contention that the trial court abused its discretion in denying a motion for mistrial, and cumulative error. We affirm.

## BACKGROUND

The charges in this case arise from a shooting captured on surveillance video. The incident occurred in the parking lot of a gas station and convenience store. It was undisputed at trial that appellant was the only shooter during this incident, and he was the one who shot the victims.

### I. The Shooting.

The confrontation began when Goosby and one of the victims, Dymon Ford, began throwing gang signs at each other.[3] A short time later, appellant appeared on the

---

[1] In the nonpublished opinion in the companion case, *People v. Goosby* (Nov. 4, 2025, F086856), we resolved Goosby's claims and affirmed the judgment. In January 2026, the California Supreme Court denied review. (*People v. Goosby*, Jan. 22, 2026, S294322.)

[2] All future statutory references are to the Penal Code unless otherwise noted.

[3] During closing argument, Goosby's trial counsel admitted that Goosby has gang tattoos, he was "throwing signs that night," and he was "wearing gang paraphernalia."

scene, and he walked towards Goosby. They stood near each other in the parking lot for one or two seconds.[4] Appellant told the jury that, during this brief encounter with Goosby, they greeted each other.[5]

Appellant proceeded toward the store, walking past Ford and positioning himself just outside the store. Goosby approached Ford directly and engaged him in conversation. After engaging with Ford, Goosby began walking towards appellant with Ford following closely behind. Goosby and Ford walked within a few feet of appellant. Just before appellant opened fire, Goosby reached over and patted at one of Ford's pockets in which Ford had his hand. Goosby's movement was consistent with a quick "pat search" to check for a weapon. Goosby later admitted to law enforcement that he touched Ford's pocket because he did not know what Ford might have.

Appellant was looking in the direction of Goosby and Ford while Goosby searched Ford's pocket. After Goosby stopped patting Ford's pocket, appellant drew a firearm and fired multiple shots at close range. Goosby was standing immediately next to Ford at the moment the shots were fired, and he made no attempt to intervene or to flee.

As the shots were being fired, Ford turned and fled into the parking lot. He was clearly injured and unable to run at any speed. At trial, appellant admitted that he continued to fire at Ford even while Ford was running away. Ford was struck with approximately four shots, but he managed to stay on his feet and flee.

---

Goosby's trial attorney told the jury that the defense would not deny that Goosby "has gang ties written all over him"

[4] Appellant arrived at the parking lot separately from Goosby. It appears that someone dropped off appellant.

[5] Appellant told the jury that he previously knew Goosby "a little" through the mother of some of his children. At trial, appellant agreed that Goosby was a family friend.

3.

Once he stopped firing, appellant briefly reached out and touched Goosby's arm. Both Goosby and appellant then jogged after Ford, who continued to flee across the parking lot.

## II. Law Enforcement Takes Appellant and Goosby into Custody.

A police officer driving in the area happened to witness part of the shooting and he immediately pursued Goosby and appellant. The officer quickly took appellant into custody. Appellant erroneously claimed to the officer that Ford had fired at him.

The firearm that appellant used in this shooting was recovered. Law enforcement determined that appellant fired seven times during this attack. In addition to shooting Ford, one of appellant's shots struck a bystander in her foot.

Goosby initially eluded law enforcement, hiding in a nearby location. Other officers found him a short time later and took him into custody.

## III. The Gang Evidence.

During the main trial, the prosecution's gang expert testified that, when this shooting occurred, Goosby and appellant were affiliated with the East Side Crips, a criminal street gang. The victim, Ford, was an affiliate of the West Side Crips. These gangs are rivals of each other in this area.

After the jury convicted appellant and Goosby, a bifurcated trial occurred regarding the gang allegations. During that phase, the gang expert opined that Goosby was a member of the East Side Crips, while appellant was an associate of that gang. According to the expert, Ford was an associate of the West Side Crips on the night he was shot. Based on a hypothetical that matched the facts of this case, the expert opined that this shooting was committed for the benefit of, at the direction of, or in association with the East Side Crips criminal street gang.

4.

**IV.    The Relevant Defense Evidence.**

Goosby did not testify at trial, and he offered no evidence on his own behalf.

Appellant testified at trial, admitting that he shot Ford. According to appellant, he fired because he was afraid for his life. Through his own testimony and that from an expert witness, he offered evidence showing he suffered from posttraumatic stress disorder (PTSD) stemming from prior incidents where he had been assaulted and shot. However, appellant's expert could not opine that appellant's behavior on the night in question was actually caused by his PTSD.

At trial, appellant denied having an agreement with Goosby to shoot at Ford. According to appellant, it was a coincidence that he and Goosby were both at that parking lot at the same time. Appellant testified that he became fearful of both Goosby and Ford because they were exchanging aggressive words with each other and he felt he needed to fire to protect himself.

Appellant told the jury that he had consumed alcohol and ingested cocaine during the day of this shooting. His mother had died on his birthday, less than a month earlier, and he was still "venting from that" and just trying to get over that." He admitted that he ingested more cocaine just before this shooting took place. He claimed that he went to the convenience store a little after 2:00 a.m. to purchase more alcohol. He took a loaded gun with him because he knew that area was dangerous and frequented by gang members. He admitted to the jury that, as a convicted felon, it was illegal for him to possess a firearm.

Appellant testified that, as appellant and Ford interacted outside the convenience store, he became fearful of both of them. Appellant claimed he had heard Ford say words to the effect that he (Ford) was going to kill both of them if they did not leave. Appellant testified that he did not aim when he fired and he did not care whether he hit appellant or Ford, he just wanted them both to get away from him.

5.

Appellant claimed to the jury that he fired to protect his own life. He believed Ford might have been armed with a firearm. He thought he saw Ford's hand coming out of his pocket. According to appellant, he shot Ford before Ford could shoot him.

At trial, appellant admitted he had subsequently learned that Ford had been unarmed when this incident occurred. However, he claimed that, in the moment, he had believed Ford was armed.

## DISCUSSION

### I. The Trial Court Did Not Abuse Its Discretion in Denying a Motion for Mistrial and Any Presumed Error is Harmless.

At trial, the prosecution's gang expert identified multiple gang-related tattoos on Goosby's body. According to the expert, most of these tattoos showed Goosby's affiliation with the East Side Crips.

One of Goosby's tattoos depicted a basketball player. The gang expert told the jury that "gang members will refer to themselves as basketball players" to express that they are "shooters" who are "violent" and they "like shooting people for fun." Goosby's counsel objected to this testimony. After an unreported sidebar, the trial court sustained the objection, struck the expert's testimony about the meaning of the basketball tattoo, and admonished the jury to disregard it entirely.

At the next break, Goosby's counsel moved for a mistrial, which appellant's counsel joined. Goosby's counsel argued that this testimony had violated an in limine ruling, it was highly prejudicial, and it could not be cured by admonition. After hearing arguments from the parties, the court denied the motion for mistrial. The court concluded that this testimony had not violated any prior orders and was the product of miscommunication rather than misconduct. The court believed its admonition was sufficient to cure any potential prejudice.

Appellant contends the trial court abused its discretion in denying the motion for mistrial. According to appellant, the gang expert's remarks about Goosby's basketball

tattoo violated an in limine ruling, it injected inflammatory and highly prejudicial character evidence into this trial, and it irreparably tainted the jury. He maintains that reversal is required because the error was not harmless under either the federal standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or the state standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

We reject appellant's arguments. The trial court did not abuse its discretion, and any presumed error is harmless.[6]

### A.     *The trial court did not abuse its discretion.*

A ruling on a motion for mistrial is reviewed for abuse of discretion. (*People v. Collins* (2010) 49 Cal.4th 175, 198.) A trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged. (*Id.* at pp. 198–199.) The court is vested with considerable discretion in ruling on mistrial motions. (*Id.* at p. 198.)

Here, the expert's comments about the basketball tattoo were isolated remarks amid otherwise proper testimony regarding Goosby's gang-related tattoos. These disputed statements were brief and never repeated. The trial court promptly struck this testimony. Such fleeting, stricken comments do not create the sort of incurable prejudice that compels a mistrial. (See, e.g., *People v. Collins, supra,* 49 Cal.4th at p. 199 [brief, improper testimony cured by prompt admonition]; *People v. Cox* (2003) 30 Cal.4th 916, 953 [timely admonition cured any prejudice], overruled on another ground in *People v Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Leavel* (2012) 203 Cal.App.4th 823, 831 [no prejudice following admonition to disregard brief testimony which was stricken].)

---

[6]     Respondent asserts that appellant forfeited this claim in failing to preserve it below. To overcome any forfeiture, appellant raises ineffective assistance of counsel. Because this claim fails on its merits, we decline to address forfeiture, thus rendering moot the assertion of ineffective assistance of counsel.

The trial court was in the best position to gauge the likely effect of this event on the jury. (*People v. Williams* (2006) 40 Cal.4th 287, 323.) The court immediately sustained the objection, struck the testimony, and admonished the jury. Jurors are presumed to follow such instructions. (*People v. Avila* (2006) 38 Cal.4th 491, 574.) Nothing in this record reasonably demonstrates that appellant's chances of receiving a fair trial were irreparably damaged from this brief testimony. Under these circumstances, it is apparent that the court did not abuse its considerable discretion in denying the motion for mistrial.[7]

### B. *Any presumed error is harmless.*

Appellant argues prejudice spilled over to him from the remark about Goosby's basketball tattoo. He contends that the jurors would have been unable to ignore the remark that Goosby liked to shoot people, which would have impacted how the jurors viewed this shooting and appellant's criminal intent. We are not persuaded. Even if we assume the trial court abused its discretion, reversal is not warranted because the record does not show prejudice under either *Watson* or *Chapman*.

It was undisputed at trial that appellant was the sole shooter during this incident. The expert's inappropriate remark concerned Goosby, not appellant, and nothing in the record reasonably suggests the jury attributed it to appellant. The admissible evidence overwhelmingly established appellant's express malice and his guilt for premeditated attempted murder. Video evidence showed appellant and Goosby working together both before and immediately after appellant fired seven shots at Ford. The evidence was undisputed that Goosby was affiliated with the East Side Crips and Ford with the rival West Side Crips. Goosby and Ford exchanged gang signs before appellant attacked Ford.

---

[7]    Although he expressly states that prosecutorial misconduct is not at issue in this appeal, appellant nevertheless asserts that the trial court should have recognized that the disputed testimony violated an in limine order, which raised the possibility of prosecutorial misconduct. Since appellant explicitly disclaims prosecutorial misconduct as an issue on appeal, we have no cause to address that potential claim.

Appellant and Goosby both chased Ford after he was shot. From all of this, a reasonable inference exists that appellant acted in concert with Goosby as part of a gang-related attack. The totality of the circumstantial evidence overwhelmingly supports the jury's true findings that appellant committed these crimes to benefit a criminal street gang. The video evidence conclusively supports the jury's rejection of self-defense.

Given this record, it is implausible that the verdicts were impacted from the isolated remarks that Goosby's basketball tattoo indicated he liked to shoot people. The video evidence overwhelmingly established appellant's guilt. Under the state standard, there is no reasonable probability appellant would have obtained a more favorable result had a mistrial been granted. (*Watson, supra,* 46 Cal.2d at p. 836.) Under the federal standard, we can declare that any presumed error was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.) Consequently, prejudice is not present under either standard of review, and this claim fails.

## II. Any Alleged Instructional Error with CALCRIM No. 3428 Was Harmless.

Based on CALCRIM No. 3428, the trial court instructed the jury regarding how to consider appellant's mental disorders, including the evidence of his PTSD. For the attempted murder charged in count 2, the jury was told it could consider such evidence in deciding whether appellant acted "with an intent to kill" or if he acted with deliberation and premeditation. The court further instructed that jurors could not consider mental health evidence in deciding whether appellant acted in complete self-defense or in evaluating the assaults charged in counts 3 and 4.

The parties dispute whether this instruction was legally correct. Appellant relies on *People v. Ocegueda* (2016) 247 Cal.App.4th 1393 (*Ocegueda*), which holds it is error to substitute "intent to kill" for "express malice" in CALCRIM No. 3428 because doing so impermissibly limits the jury's consideration of mental disorder evidence. (*Ocegueda,* at p. 1407.) Based on *Ocegueda*, the Bench Notes to CALCRIM No. 3428 now caution

9.

against a trial court from doing what occurred here—instructing with " 'intent to kill' " language in an attempted murder case instead of using " 'express malice.' "

Respondent argues that *Ocegueda* is distinguishable. Attempted murder requires proof of a specific intent to kill. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) From respondent's perspective, the trial court's instruction tracked the actual elements of the charged offense and did not preclude jurors from considering appellant's mental health evidence for other aspects of his conduct.

The parties' competing arguments illustrate the density and complexity of delineating the proper role of mental disorder evidence. Rather than shift through the parties' complex disagreements, we conclude this claim can be resolved more efficiently if we focus on prejudice. We conclude that, even if we assume instructional error occurred with CALCRIM No. 3428, any potential error is harmless.

According to appellant, the alleged instructional error relieved the jury of its duty to consider his PTSD to explain all facets of his conduct. He asserts at least one juror could have been persuaded to acquit him of attempted murder after deciding he acted reasonably to defend himself, resulting in lawful self-defense. He maintains the court's inclusion of "intent to kill" in CALCRIM No. 3428 prevented the jury from considering his PTSD evidence to support imperfect self-defense, to negate consciousness of guilt, or to undermine the prosecution's gang theory. Appellant contends a properly instructed jury could have used the PTSD evidence to draw an inference that he fled from police immediately after this shooting—not from consciousness of guilt—but because he was frightened beyond reason. Likewise, instead of finding a false statement made to law enforcement, appellant contends that the jury could have reasonably concluded he genuinely believed Ford had fired one or more shots at him. Appellant also argues that jurors could have believed he only reflexively made that false statement to officers who, with their guns drawn and pointed at him, activated a fear response derived from his earlier interactions with police in his neighborhood.

10.

Appellant asserts that the alleged instructional error requires reversal under *Chapman* because it deprived him of a complete defense. In the alternative, he argues that reversal is required even under the state standard of *Watson*.

Appellant's arguments regarding prejudice are unpersuasive. This record amply demonstrates that any potential error was harmless under either *Watson* or *Chapman*. Consequently, we need not resolve the parties' disputed points regarding which standard of review we should employ. This claim fails under either standard.[8]

Express malice and an intent to unlawfully kill are legally identical. (*People v. Smith, supra,* 37 Cal.4th at p. 739.) Attempted murder requires proof of express malice, meaning a deliberate intent to unlawfully take a life. (*Ibid.*; see also § 188, subd. (a)(1).) Thus, where the evidence shows a purposeful attempt to kill, express malice is necessarily demonstrated.

Here, the evidence of express malice was overwhelming. Surveillance footage showed appellant firing repeated shots at Ford and then pursuing him. The attack stopped only because a police officer intervened. Nothing in this sequence suggests reflexive, accidental, or fear-driven conduct. Instead, the video evidence overwhelmingly and conclusively demonstrates a sustained, goal-directed effort to kill.

Appellant's theory depends on the premise that, had jurors been instructed using the phrase "express malice," they might have accepted his claim of self-defense based on PTSD. But the jury's actual findings foreclose that premise. The jury found that the attempted murder was willful, deliberate, and premeditated, and also found true a lying-in-wait allegation.[9] Those findings necessarily reflect that jurors concluded appellant acted with planning, reflection, and calculated purpose—conclusions that are

---

[8]     Because this claim fails on its merits due to a lack of prejudice, we need not address forfeiture or ineffective assistance of counsel.

[9]     Appellant notes that a theory of lying in wait for attempted murder was likely error, but since the jury returned true findings on both lying in wait and premeditation/deliberation, he does not raise this issue on appeal.

11.

fundamentally incompatible with a claim that his conduct was driven by panic, confusion, or an uncontrollable response to trauma.  Because the jury rejected the factual foundation of appellant's theory, the wording of CALCRIM No. 3428 could not have altered the outcome.

Other jury instructions further negate any risk of prejudice.  The jury was instructed with CALCRIM Nos. 600 (attempted murder), 601 (premeditation and deliberation), 505 (self-defense), and 604 (attempted voluntary manslaughter based on imperfect self-defense).  None of these instructions required the jury to engage with the concept of "express malice" or "malice aforethought."  As such, any potential instructional error with CALCRIM No. 3428 did not mislead the jurors or impact their deliberations on the charges and defenses.

With CALCRIM No. 604 (attempted voluntary manslaughter based on imperfect self-defense), the jury was told to consider "all the circumstances as they were known and appeared" to appellant when evaluating appellant's belief in the need to defend himself.  This instruction ensured that the jury could fully consider appellant's claimed PTSD, and how it influenced his belief that he was in imminent danger or believed that the immediate use of deadly force was necessary.

With CALCRIM Nos. 362 and 372, the jurors were informed that appellant's false or misleading statement, and his flight from the scene, could show a consciousness of guilt.  Nothing in these instructions barred the jury from considering alternative explanations for appellant's behavior, such as his PTSD, fear, confusion, or panic.

Finally, we reject appellant's contention that he was unable to present a full defense.  Through his own testimony and that from an expert witness, he offered evidence showing he suffered from PTSD stemming from prior incidents where he had been assaulted and shot.  However, appellant's expert could not opine at trial that appellant's behavior on the night in question was actually caused by his PTSD.  The jury was instructed on self-defense and imperfect self-defense.  The jury was free to consider

12.

appellant's PTSD in evaluating his perception of danger and use of force. The jury nevertheless rejected those theories.

Given the overwhelming video evidence, the jury's express findings of premeditation and lying in wait, and the instructions allowing full consideration of appellant's mental health evidence, any potential instructional error was harmless. It is beyond a reasonable doubt that the alleged error did not contribute to the verdicts. (*Chapman, supra,* 386 U.S. at p. 24.) Likewise, it is not reasonably probable appellant would have achieved a more favorable outcome had CALCRIM No. 3428 used the term "express malice." (See *Watson, supra,* 46 Cal.2d at p. 836.) This claim fails due to a clear lack of prejudice.

## III.   Cumulative Error Did Not Occur.

Appellant argues that his claims above are closely related because everything at trial revolved around the crucial question of whether he acted out of self-defense or carried out a planned gang shooting. He contends that, if any claimed error is found to fall short of justifying reversal, their combined effect rendered the possibility of a fair trial unreachable. We disagree.

"Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial." (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) Cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

We reject appellant's claim of cumulative error because his individual claims above are meritless. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [cumulative prejudice argument rejected because each individual contention lacked merit or did not result in prejudice].) Taking these combined claims into account, we are satisfied that appellant received a fair adjudication.

**IV.     Substantial Evidence Supports the Gang Allegations.**

Appellant argues the evidence was insufficient to establish that the East Side Crips qualify as a "criminal street gang" under section 186.22.  He contends the prosecution failed to show an organized association or group.  He also asserts the prosecution failed to prove that the predicate offenses provided a nonreputational benefit to the gang.  We are not persuaded.

**A.     *The prosecutor established the existence of a qualifying criminal street gang.***

Section 186.22, subdivision (f), defines a "criminal street gang" as an "ongoing organized association or group" of three or more persons, having a common name or identifying sign or symbol, whose members collectively engage in a pattern of criminal gang activity.  The gang's organizational structure may be formal or informal.  (*People v. Superior Court (Farley)* (2024) 100 Cal.App.5th 315, 333 (*Farley*).)

Appellant argues that the gang expert failed to identify any relationship between the gang subsets, beyond a notion that they "pay respect" to the larger gang identity.  Appellant relies on (1) *People v. Clark* (2024) 15 Cal.5th 743 (*Clark*); (2) *Farley*, *supra*, 100 Cal.App.5th 315; and (3) *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*).  These opinions do not assist him.

In *Clark*, our high court reiterated that the prosecution must show a nexus between a gang organization and an offense committed by one or more gang members.  (*Clark*, *supra*, 15 Cal.5th at p. 762.)  An organizational nexus may be shown "by evidence linking the predicate offenses to the gang's organizational structure, meaning its manner of governance; its primary activities; or its common goals and principles."  (*Ibid*.)

In *Farley*, the appellate court held that "a 'criminal street gang' under section 186.22(f) may be formal or informal."  (*Farley*, *supra*, 100 Cal.App.5th at p. 330.)  An informal organization can be shown through "collaboration, long-term relationships, use of the same turf, and behavior demonstrating a shared identity."  (*Ibid.*)

The *Farley* court noted that "there is no single way to demonstrate the organizational structure section 186.22(f) requires." (*Farley*, *supra*, at p. 333.)

Here, the prosecution's gang expert testified that the East Side Crips consist of more than three members who all identify under that common name. These gang members use common signs, symbols and colors. The expert explained the traditional boundaries of this gang. Subsets exist within the traditional boundaries, and the subsets "pay respect to the same gang, and they are all the same gang." The expert analogized the East Side Crips as a tree with the subsets as branches. The expert explained the gang's primary activities, which included the illegal possession of firearms.

The prosecution introduced into evidence three predicate offenses committed by East Side Crips members. The predicate offenses involved separate incidents in which multiple gang members illegally possessed firearms. In the first predicate offense, multiple East Side Crip gang members were live streaming on social media when one member pointed a firearm at the camera while another made derogatory hand signs toward a rival gang. In the second predicate offense, two armed members of the East Side Crips were apprehended shortly after a shooting that had occurred in rival gang territory. The third predicate offense involved three gang members who were detained during a traffic stop. A loaded firearm was in the center console of the vehicle. According to the gang expert, firearm possession benefited the gang by enabling its members to enter rival territory, protect each other, and commit other crimes of opportunity, such as burglaries and carjackings.

The trial evidence amply demonstrated an ongoing association of three or more people with a common name, symbols, and territory. The evidence showed that members of the East Side Crips have engaged in a pattern of criminal gang activity. Thus, the statutory elements were met. (See § 186.22, subd. (f).) The jury was instructed with CALCRIM No. 1401, which required it to find these elements beyond a reasonable doubt. Substantial evidence supports the jury's findings. Taken together, the expert's

testimony and the predicate offenses provided the jury with ample evidence to conclude that the East Side Crips were a qualifying criminal street gang. The prosecution showed a "nexus between the individual predicate offenses and the gang as an organized, collective enterprise." (*Clark*, *supra*, 15 Cal.5th at p. 749.) Appellant's reliance on *Clark* and *Farley* is unavailing.

Nor does *Prunty*, *supra*, 62 Cal.4th 59 alter the result. *Prunty* held that, when a prosecution's case turns on the existence and conduct of one or more gang subsets, then the prosecution must show some associational or organizational connection uniting those subsets. (*Id.* at p. 71.) In *Prunty*, the prosecution failed to introduce sufficient evidence showing "an associational or organizational connection" between the defendant's gang and the two subsets that committed the requisite predicate offenses. (*Id.* at p. 81.)

The concern in *Prunty* does not exist here. The predicate offenses in this trial were all committed by members of appellant's gang, the East Side Crips. No subsets were identified. Consequently, *Prunty* is distinguishable.

Viewing the record in the light most favorable to the judgment, substantial evidence supports the jury's finding that the East Side Crips constitute a "criminal street gang" within the meaning of section 186.22, subdivision (f). The prosecution established not just shared symbols, but an ongoing, coordinated association whose collective criminal activity supported the statutory definition.

**B.** ***The prosecutor established a benefit to the gang that was more than reputational.***

Appellant next contends the prosecution failed to prove that the predicate offenses provided a benefit to the East Side Crips that was more than reputational. We disagree.

Predicate offenses must commonly benefit a gang, and the benefit must extend beyond mere reputation. Examples of qualifying benefits include retaliation against rivals, intimidation of witnesses, or facilitating other criminal opportunities. (§ 186.22, subd. (g).)

Appellant contends that the gang expert merely speculated when explaining how the predicate offenses provided a benefit to the gang that was more than reputational. He relies on *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), *In re Frank S.* (2006) 141 Cal.App.4th 1192 (*Frank S.*), and *People v. Soriano* (2021) 65 Cal.App.5th 278 (*Soriano*). These three opinions do not assist him.

In *Ramon*, the defendant and another gang member were stopped in a stolen truck. A handgun was recovered. (*Ramon, supra*, 175 Cal.App.4th at p. 847.) The prosecution's gang expert merely opined that gangs use such tools to commit crimes, but no evidence was introduced to show this particular truck or gun were connected to gang activity. (*Id.* at p. 848.) The appellate court reversed, finding that the gang expert's opinion was speculative. (*Id.* at p. 851.) The appellate court also concluded that the gang expert had lacked sufficient facts to opine about the defendant's specific intent. (*Id.* at pp. 852–853.)

In *Frank S.*, the prosecution's gang expert asserted that a minor's possession of a knife benefitted the minor's gang. (*Frank S., supra*, 141 Cal.App.4th at p. 1199.) A panel from this court reversed the gang enhancement. The panel noted that the prosecution had not presented any evidence that the minor was in gang territory, had gang members with him, or had any reason to expect to use the knife in a gang-related offense. (*Ibid.*) In fact, the minor had told an arresting officer "that he had been jumped two days prior and needed the knife for protection." (*Ibid.*) This court held it was improper to allow the expert to state the minor's specific intent for the knife without any other substantial evidence. (*Ibid.*)

In *Soriano*, two gang members were walking together in their gang's territory where they both lived, and police detained them. A knife was found in the defendant's pocket. (*Soriano, supra*, 65 Cal.App.5th at p. 281.) A gang expert opined that the defendant carried the knife for the benefit of, in association with, and with the intent to promote his gang. A jury found true a gang enhancement allegation. (*Ibid.*) The

17.

appellate court reversed the enhancement based on insufficient evidence. There were no facts showing that the defendant was acting on his own behalf, or whether he was acting on behalf of his gang. Nothing showed an intent to use the knife. (*Id.* at p. 289.) Although he was with another gang member, nothing showed that the crime of carrying a concealed knife was gang related. (*Id.* at p. 290.) In short, the expert's opinion was based on speculation. (*Ibid.*)

In contrast to *Ramon*, *Frank S.*, and *Soriano*, the prosecution here did not rely on speculation to establish the gang enhancement allegations. Goosby was a member of the East Side Crips[10] and Ford was associated with the rival West Side Crips. Appellant admitted to the jury that he knew or at least suspected that Goosby and Ford were involved in a gang when this incident occurred. Goosby and Ford exchanged gang signs with each other before appellant tried to kill Ford. After firing at Ford, appellant tapped or touched Goosby, who then joined appellant in pursuing Ford across the parking lot. From the totality of the evidence, the jury had ample grounds to draw a reasonable inference that appellant committed this crime for the benefit of, in association with, and with the intent to promote the East Side Crips. *Ramon*, *Frank S.*, and *Soriano* are distinguishable.

Moreover, the prosecution introduced certified conviction records establishing that members of appellant's gang were convicted of firearm-related offenses in three separate predicate cases. The officers who investigated those cases testified about the circumstances of the crimes. The gang expert explained that firearm possession is a primary activity of the East Side Crips. The expert testified that firearm possession allows gang members to travel into rival gang territory by enabling members to protect one another. It also facilitates crimes of opportunity, such as carjackings and burglaries.

---

[10] During closing argument, Goosby's trial counsel admitted that Goosby has gang tattoos on his body, he was "throwing signs that night," and he was "wearing gang paraphernalia." Goosby's trial attorney told the jury that the defense would not deny that Goosby "has gang ties written all over him"

The expert opined that the three predicate offenses provided a common, nonreputational benefit to appellant's gang.

This record contains substantial evidence from which a rational jury could conclude that the predicate offenses established a common, nonreputational benefit to the East Side Crips. The certified conviction records, corroborated by officer testimony, demonstrated that multiple members of appellant's gang engaged in coordinated firearm possession across three separate incidents. The gang expert explained why such conduct advanced the gang's objectives of protection and opportunity for additional criminal activity. This testimony did not rest on speculation but on concrete, admissible evidence of coordinated gang behavior.

The jurors were instructed with CALCRIM No. 1401, requiring them to find a benefit to the East Side Crips that was more than reputational. Viewing the record in the most favorable light to the judgment, a rational jury could conclude that the predicate offenses introduced in this trial met the requirements of section 186.22, subdivision (g). This evidence was reasonable, credible and of solid value. Thus, a reasonable jury could find the gang allegations true beyond a reasonable doubt. (See *People v. Albillar* (2010) 51 Cal.4th 47, 59–60 [articulating this standard for gang enhancements].) This claim fails.

## V. Substantial Evidence Supports the Imposition of Upper Terms.

In relevant part, the trial court found true certain factors in aggravation, including that (1) appellant's violent conduct indicated he posed a serious danger to society; and (2) his prior convictions were numerous or of increasing seriousness. (See Cal. Rules of Court, rule 4.421(b).)[11] For the two assaults with a semiautomatic firearm (counts 3 & 4), appellant received upper terms, but the sentence in count 4 was stayed.

---

[11] All future references to a rule refer to the California Rules of Court.

In the present claim, appellant contends that substantial evidence does not support these two factors in aggravation. We disagree.

A court may impose an upper term only if aggravating circumstances are found true beyond a reasonable doubt by the trier of fact. (§ 1170, subd. (b).) On appeal, we review those findings for substantial evidence. (*People v. Mendez-Torres* (2025) 113 Cal.App.5th 1007, 1020.) Only a single factor in aggravation is needed to justify an upper term sentence. (*People v. Osband* (1996) 13 Cal.4th 622, 728.) "The essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People v. Moreno* (1982) 128 Cal.App.3d 103, 110.)

### A. *Appellant's conduct shows he poses a serious danger to society.*

Appellant argues that his prior criminal record is too sparse to support the imposition of upper term sentences. He is mistaken. The record amply supports the trial court's finding that appellant's violent conduct indicates he poses a serious danger to society. (Rule 4.421(b)(1).)

Through certified records, the prosecution established appellant's criminal history, including both juvenile and adult offenses.

In 2011, the juvenile court sustained an allegation of infliction of corporal injury to a cohabitant (§ 273.5, subd. (a)).

In 2012, the juvenile court sustained an allegation of infliction of corporal injury to a cohabitant (§ 273.5, subd. (a)), and the juvenile court sustained an allegation of making criminal threats (§ 422).

In 2014, as an adult, appellant had separate convictions for felony false imprisonment (§ 236) and two misdemeanor convictions for public intoxication (§ 647, subd. (f)).

In 2015, appellant had a felony conviction for failure to appear (§ 1320, subd. (b)).

In 2019, appellant had a misdemeanor conviction for driving under the influence (Veh. Code, § 23152, subd. (a).)

The current crimes occurred in 2022. These convictions for attempted murder and two assaults with a semiautomatic firearm, though serious, do not themselves count as "prior convictions" for purposes of rule 4.421(b). Juvenile adjudications, like adult convictions, may be considered in assessing aggravating factors. (Rule 4.421(b)(2).)

As a juvenile, appellant twice inflicted corporal injury to a cohabitant. As an adult, he was convicted of false imprisonment. Thus, this record amply reflects an ongoing pattern of violent conduct.

Moreover, appellant's conduct in the present matter justifies the trial court's aggravated sentence. Appellant fired his gun seven times in a public parking lot, striking both the intended victim and an innocent bystander. Other bystanders were present, and they could have been easily struck. Appellant's egregious conduct made this incident distinctively worse than an ordinary assault with a firearm. The trial court, therefore, could reasonably find beyond a reasonable doubt that appellant "has engaged in violent conduct that indicates a serious danger to society." (Rule 4.421(b)(1).) The court properly relied on the way appellant committed the present crimes and on his demonstrated pattern of escalating criminal conduct. Substantial evidence supports this factor in aggravation.

**B.** ***Appellant has suffered numerous prior convictions that are becoming more serious.***

Substantial evidence also supports the finding that appellant's prior convictions were numerous or increasingly serious. (Rule 4.421(b)(2).) Between 2011 and 2019, appellant accumulated at least eight adjudications and convictions, including two adjudications of inflicting corporal injury on a cohabitant and a felony false imprisonment. The trajectory of appellant's behavior—from violent juvenile adjudications in 2011 and 2012, to adult misdemeanors in 2014, to an adult felony in 2014, to another felony in 2015, and then to further criminal conduct in 2019—reflects both numerical sufficiency and escalation in seriousness. The trial court could

reasonably determine this record was more than sufficient to satisfy this factor in aggravation.

### C. *Conclusion.*

The record overwhelmingly supports the trial court's findings that appellant has engaged in violent conduct indicating he poses a serious danger to society, and that his convictions were numerous or increasingly serious. (Rule 4.421(b)(1) & (2).) Moreover, the court also found true other factors in aggravation, such as the crime involved great violence (rule 4.421(a)(1)) and the manner in which the crime was carried out indicated planning and sophistication (rule 4.421(a)(8)). Appellant does not challenge the sufficiency of the evidence for these factors, and only a single valid aggravating factor is necessary to justify the imposition of an upper term sentence. (*People v. Osband*, *supra*, 13 Cal.4th at p. 728.) Accordingly, a remand for resentencing is unwarranted and this claim fails.

## VI. The Trial Court Did Not Abuse Its Discretion in Imposing Upper Term Sentences in Counts 3 and 4.

In counts 3 and 4, appellant received upper-term sentences for his two convictions of assault with a semiautomatic firearm. The sentence for the assault of Ford was stayed.

Appellant asserts that the trial court abused its discretion by failing to apply the presumption in favor of a low term under section 1170, subdivision (b)(6). He argues that—because of his youth,[12] traumatic background, and mental health disorders—the court was prohibited from imposing anything but the low term unless it expressly found that the factors in aggravation outweighed those in mitigation. He contends that the court failed to articulate its sentencing choices on the record as required by statute.

---

[12] Appellant was approximately 27 years old when the present crimes occurred in 2022.

## A. *The governing law.*

Section 1170, subdivision (b)(6), provides that, where the defendant's youth, trauma, or mental illness (among other considerations) was a "contributing factor" in the commission of the offense, the trial court shall impose the low term unless it finds that aggravating circumstances outweigh mitigation and justify a sentence exceeding the low term, or that imposition of the low term would be contrary to the interests of justice. (§ 1170, subds. (b)(6)(A)–(C).)  The sentencing court must state its reasons for its sentencing choice on the record at the time of sentencing. (*Id.*, subd. (c).)

A sentencing decision is reviewed for abuse of discretion. (*People v. Sandoval* (2007) 41 Cal.4th 825, 847.)  A court abuses its discretion when it acts arbitrarily, relies on improper considerations, or fails to exercise informed discretion. (*People v. Panozo* (2021) 59 Cal.App.5th 825, 837.)  Absent an affirmative showing to the contrary, we presume the trial court understood and applied the law correctly. (*People v. Thomas* (2011) 52 Cal.4th 336, 361; see also rule 4.409 [all relevant sentencing factors "will be deemed to have been considered unless the record affirmatively reflects otherwise"].)

## B. *Factual background.*

Prior to sentencing in this matter, appellant filed a memorandum emphasizing his difficult upbringing, including being shot in the head with a pellet gun at the age of 13, and then later being shot in the neck and stabbed as an adult.  His memorandum also detailed his mother's recent death, and his mental health diagnoses of antisocial personality disorder, PTSD, and major depressive disorder.  Counsel urged the court to impose only a single life term with concurrent sentences, and to strike additional enhancements.

In contrast, the probation department recommended upper terms for the assault counts, citing multiple factors in aggravation, including the violent nature of this crime, appellant's criminal history, and his danger to society.  Probation also recommended consecutive sentences.

At sentencing, appellant's counsel reiterated appellant's mitigating history and asked the court to impose a sentence of 15 years to life and to strike additional enhancements where possible. Defense counsel mentioned Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81), asking the court to strike enhancements.[13] Finally, counsel argued that count 3 (assault with a semiautomatic firearm) should run concurrently.

The trial court expressly stated it had reviewed the recommendations from the probation department. The court declined to adopt probation's finding that the victim was "particularly vulnerable" but agreed with the remaining aggravating factors. The court observed that, while appellant's prior criminal record was "relatively minor," the seriousness of the present offenses—including his decision to fire multiple shots in public—outweighed any suggestion that mitigation "would be appropriate."

### C.     *Analysis.*

#### 1.     **We decline to find forfeiture.**

Respondent contends that appellant has forfeited this claim by failing to specifically invoke at sentencing the low-term presumption found in section 1170, subdivision (b)(6). In response, appellant asserts that the court had an obligation to comply with the requirements of section 1170 so that forfeiture should not apply. In the alternative, appellant contends that any forfeiture should be excused due to ineffective assistance of counsel.

Courts are currently split on whether a defendant can forfeit a claim on appeal that the trial court misunderstood the scope of its sentencing discretion under section 1170, subdivision (b)(6). (See *People v. Fredrickson* (2023) 90 Cal.App.5th 984, 994, fn. 8 [claim that trial court should have applied lower-term presumption is not subject to

---

[13]     Senate Bill 81 expanded juridical discretion to dismiss sentencing enhancements in the interest of justice by identifying circumstances that weigh strongly in favor of dismissal. (Stats. 2021, ch. 721, § 1; see § 1385, subds. (c)(1), (2)(A)–(I).)

forfeiture]; but see *People v. Achane* (2023) 92 Cal.App.5th 1037, 1043–1047 [claim under section 1170, subdivision (b), forfeited by failing to raise issue below].)

We need not decide whether appellant forfeited this claim because, assuming the claim is properly before us, this record does not reflect that the trial court abused its discretion in imposing upper-term sentences. Thus, because the claim fails on its merits, we need not address whether it was forfeited or whether defense counsel rendered ineffective assistance.

### 2. This claim fails on its merits.

To trigger the presumption of a low term under section 1170, subdivision (b)(6), the defendant's youth, trauma, or mental illness must have been a "contributing factor" in the commission of the offense—that is, it must have played a causal role in bringing about the criminal conduct. (§ 1170, subd. (b)(6); *People v. Fredrickson*, *supra*, 90 Cal.App.5th at pp. 992–993.)

Here, the record affirmatively refutes any causal connection. Appellant's mental health expert could not opine that appellant's conduct was caused by PTSD or any other mental illness. The video evidence established that appellant deliberately positioned himself and fired multiple rounds at close range. Based on the verdicts, the jury rejected appellant's claim that PTSD or mental health issues explained his criminal conduct. The jury found that the attempted murder was premeditated and deliberate. Thus, contrary to appellant's assertion, the presumption for a low term was never triggered under section 1170, subdivision (b)(6).

In any event, even assuming the low-term presumption applied, the trial court acted well within its discretion in concluding that factors in aggravation outweighed the factors in mitigation. The record established multiple valid aggravating factors, including the extreme violence of the offense, the grave risk posed to multiple victims and bystanders, and appellant's criminal history reflecting a pattern of increasingly serious conduct. These factors independently justified the imposition of upper-term sentences.

Only a single valid aggravating circumstance is required to support an upper term. (*People v. Osband*, *supra*, 13 Cal.4th at p. 728.)

We reject appellant's contention that, because firearm enhancements were imposed, the trial court improperly relied on appellant's use of a firearm to aggravate his sentence. The rule against dual use of facts prohibits a court from imposing an upper term based on a fact that represents an element of the underlying crime or an enhancement. (*People v. Scott* (1994) 9 Cal.4th 331, 350; see also rule 4.420(h).) However, a sentencing court may consider such aggravating facts if they extend beyond the elements necessary to establish the crime. (*People v. Castorena* (1996) 51 Cal.App.4th 558, 562 [dual use rule not violated where facts used to aggravate sentence were not required for the underlying crime].)

Here, the trial court found that appellant engaged in an "egregious act of violence" in public that was "reckless" when he fired "multiple rounds" that endangered bystanders. These circumstances extended well beyond the statutory elements of the firearm enhancements that the jury found true under section 12022.53, subdivision (d)— that appellant personally discharged a firearm causing great bodily injury—and section 12022.5, subdivision (a)—that he personally used a firearm. The circumstances of appellant's criminal conduct properly supported the imposition of upper terms without violating the rule against the dual use of facts.

Finally, the record shows that the trial court articulated its reasoning and weighed both aggravating and mitigating factors. The court expressly acknowledged appellant's mental health history and his "relatively minor" prior record, but concluded those factors were outweighed by the gravity of the crimes and the threat appellant posed. Appellant's trial counsel raised Senate Bill 81 and urged leniency. The court nonetheless exercised its discretion to impose the upper terms. Absent an affirmative showing otherwise, which does not appear in this record, we presume the court understood and applied the law correctly. (*People v. Thomas*, *supra*, 52 Cal.4th at p. 361.)

Based on this record, the trial court did not abuse its sentencing discretion.[14]  The evidence did not establish that appellant's youth, trauma, or mental illnesses were contributing factors to these offenses, and even if the statutory presumption applied, substantial aggravation amply justified upper terms.  The court did not improperly engage in the dual use of facts but reasonably relied on appellant's broader criminal conduct to conclude that the aggravated sentences were appropriate.  The court reviewed probation's recommendations, weighed mitigation, and explained its choices on the record.  Accordingly, appellant's arguments are unpersuasive, and this claim fails.

## DISPOSITION

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

MEEHAN, J.

DESANTOS, J.

---

[14]     Because the trial court did not abuse its discretion, we do not address appellant's arguments that a remand is required for a new sentencing hearing.

27.